And good morning again. My name is Dean Stewart. I'm here for Dr. Atiyensalem, who you will hear in the record called Dr. Sale. Everybody seems to know him by that. I wanted to start, if I may, just for a few moments on the Santos case out of the Supreme Court. I had a chance to briefly review the government's supplement response last night. One of the problems, of course, is that it's a plurality opinion, and that is really a problem for everybody. But I would suggest this particular case, because of the way Santos is set up with Justice Stevens's concurrence, I would call it plurality plus, the same way United Airlines has economy plus and gives you a couple of extra inches. The couple of extra inches here is Justice Stevens's concurrence with the fact that proceeds equal profits. Justice Stevens then goes on to limit it to this particular Santos facts of a lottery. Counsel, let's assume that we either decide or assume for the sake of the decision that profits are required. Why isn't there sufficient evidence here, ample evidence of profit, that terminology is used in some of the testimony? And the trier of fact is not required to believe that this enormous amount of money is interest on a loan. Yes, Your Honor. And I thought the interesting part of the plurality is the last paragraph, and I think it answers that question. It talks about, in addition to Mr. Santos, also about Diaz, the employee of Santos. And what it talks about is the fact that the expenditure of money off to an employee is part of Santos's cost of doing business. In this case, I would say it's exactly the same. It's Mr. Mijed who is running the operation with the assistance of Sarabia and others. And just like Diaz, the employee, the money back to Dr. Salem is the cost of doing business. You look at it, the perspective must be from the heart of the conspiracy, if you will, and that's why it's the same. Except that when we're reviewing the sufficiency of evidence, we review the evidence in the light most favorable to the verdict. And so if we do that, why wouldn't we still find that there's evidence of profit? Right. Specifically to your client, giving X amount of money and getting back X plus $200,000, give or take. Right. And again, it comes back to the employee, Diaz, who is getting a paycheck. The money that goes to him is not profits, even though, let's say, he gets $5,000 a week. Mr. Diaz will get paid whether Mr. Santos clients all hit the lottery and Santos loses money. It's a cost of doing business. Now, here, the $50,000 that was put up by Dr. Salem would not be repaid until Sarabia got the money. And then he got $215,000. That means a sale was made. And Mr. Mizyad, when testifying and saying he didn't want these people to come from Canada and tried to keep them out of L.A., they came to get their profits. He uses that language. Taking off on what Judge Graber just said, if we give the evidence the best view we can because of our jurisprudence, why doesn't that just make the case between Diaz and Santos a different case completely and not analogous? Well, a couple of things, Your Honor. First, I don't think we can assume that if Santos hadn't made money on the lottery that Diaz would have gotten paid. The paycheck that he gets depends upon the success of the operation. That's the same thing with Dr. Salem. The success of the operation depends on whether or not he, in fact, gets repaid. The fact, and I would say the fact- Except he's a financial investor, not an employee. It's like the difference between the shareholders of Corporation X. I was going to say General Motors, but that's not a good way to use that analogy. And the employees of Corporation X. One may not get paid because there's not money to pay them with, but they're not out to make money. This person was out to make money. Right, but both the employee and the investor, the money that goes to them is the cost of doing business no matter what the enterprise is. So, for example, Ford, not GM, but Ford, they have a bank that, in fact, invests money into them. The repayment of the money that's invested, the loan money, is the cost of business to Ford. On that reasoning, every single cent that's spent is the cost of doing business, and it's just ridiculous. Well, I wouldn't call it ridiculous, Your Honor. I would say that it's in keeping with the Santos plurality, and particularly- Which? Which, at the end, talks about the fact that that salary is a cost of doing business. Let me ask you a serious question. Sure. Just to follow. Whatever we do, whatever effect Santos has here, it's plain error review. I agree. I agree. So where does that fit in? That fits in, Your Honor. And all of this became – I had a deja vu back to Bailey v. U.S. in 1995, Supreme Court case having to do with the definition of use of guns. What happened there was a plain error review. The error was, in fact, plain because the definition had changed. And back at Federal Defenders when I was there, we spent about a year going back with Ritz getting everybody to change. Well, with a completely fractionated opinion that nobody knows what it means. I mean, really, how could the error, if any, possibly be plain? Well, and I would suggest that this is where the whole rule of lenity comes into play here. The defendant should get the benefit of the doubt when it's, okay, and they – That's what the plurality said. Then you're just coming back around to asking us to adopt the plurality. Well, again, it comes back to my view that this is the plurality. Plus, we get the extra little – we're at 4.5 justices because of Justice Stevens' concurrence. Okay. Let me just have a couple more minutes. Let me, if I may, move on to my other issues. First, the Munoz case right before me sounded remarkably like the case that we have here. The Rule 16 violation, as I was preparing for these – for the argument, I really kind of focused more on 16b than 16a, because I think it's much more applicable. There you're talking about any relevant written or recorded statement by the defendant. Here we have notes of this Officer Chafee, who has, in fact, apparently verbatim taken down what he heard Dr. Salem say. And somehow those were never produced. I think the record is clear. I think there's also a difference here in the sense that it appears that they were purposefully hidden. There's a story about, gee, we gave them to the first counsel, but they don't have a base number. Then we faxed them to trial counsel, but, gee, we found out that didn't make it through. And then trial counsel's statement on that day saying, I have seen these notes now. If you cut to the bottom line, the district court said, look, we'll give you an opportunity of having more time after direct, and you can recall, Chafee, if you want to do that. And the government said, sure, we'll bring him back from Chicago. Neither opportunity was pursued. Therefore, why didn't the district court's remedy cure whatever problem there was? Well, the remedy was to just let the witness go. Well, no. The remedy was what I said. You could ask for more time if you needed it, and you could have the witness recalled. I believe what happens there is it dovetails into our last argument. The argument's about whether or not competent counsel was effective during the trial, part and parcel of the fact that he wasn't a lawyer at the time, but he had these other problems as well. And this was certainly one of them, because I agree with the Court, there was a number of other things that defense counsel could have, should have done. And those just did not happen. Okay. I just really hate to see you the victim of violence from your co-counsel. And I agree, Your Honor. I'll sit down. Good morning, Your Honors. It's not true. I'm a peaceful man. Your Honors, when I mooted this case at Federal Defenders, I was advised that I should try to surmise the reasonable cause to believe three different jury instruction flaws into one synthesis, one statement. And I think this is the statement. The jurors reading the instructions could have decided that they didn't need to determine whether Ms. Jackson actually knew that pseudoephedrine would be used to manufacture methamphetamine. I'm sorry. Could you just say that one more time? I just didn't hear you. The jurors could have read the instructions and found that they didn't need to find that Ms. Jackson actually knew or had facts known to her which would make her know that the pseudoephedrine was to be made into methamphetamine. And because they could convict without finding her mens rea, these jury instructions are irretrievably flawed. Now, no one knows why the government chose to charge two different conspiracies in a single count. But they were inviting this error. This is the problem with the jury's general verdict. The general verdict says she is guilty of conspiracy. But it doesn't tell us how they got there. It doesn't tell us whether the jurors found that Ms. Jackson knew that pseudoephedrine could be used to make methamphetamine and would be used to make methamphetamine. They could just find that, well, living with Mr. Mizjed, she should know. Now, this story would produce a fine law school final were it not so tragic. Ms. Jackson is not your normal criminal defendant. She has no prior record. Her involvement with Mr. Mizjed was one of great emotional trauma. She had a miscarriage of twins while she was with him. She has a lifetime history of emotional and sexual abuse. So she is really the one of the most sympathetic defendants I have ever run across. And these jury instructions didn't require the jury to focus on what her personal criminal intent was. Now, my first theoretical point, which I don't think can be disagreed with, is that you can't conspire to commit a negligent act. A conspiracy is an agreement. Well, I mean, the problem is that's not what the instructions actually did. The instructions accurately reflected the statutory elements. Except that Your Honor's case in Joe Hall explains that reasonable cause of belief doesn't just mean some objective standard. Look, I completely agree with that, and it seems to me that that argument goes to whether there's sufficiency of the evidence, not to whether the instructions were somehow deficient. Judging by the nodding, I will turn to the sufficiency of the evidence then. The government's sufficiency comes down to two witnesses, David Wallace and Miguel Sarabia. David Wallace and Miguel Sarabia, upon arrest, were asked, who is involved in Mr. Michette's organization? Neither of them mentioned. Wallace and Sarabia testified, I think, sufficiently to establish that Ms. Jackson knew that she was transporting pseudo-federine. Yes. What I don't, I could define, and perhaps you can help me, is some evidence that would lead a reasonable person in Ms. Jackson's position to conclude that pseudo-federine was used in the manufacture of methamphetamine. I guess that part of my brief came through. That's exactly what I'm trying to point out, is that their government has no, they're missing that part of the chain. They don't have a single witness that testifies to that Ms. Jackson knew that pseudo-federine was used or could be used to manufacture methamphetamine. And without that, they don't, they can't win the reasonable cause to believe or the aiding and abetting of the manufacture of methamphetamine. Miguel Sarabia certainly doesn't give them that. Miguel Sarabia has Mr. Michette receiving large sums of money. Mr. Wallace, all that can be said about him is he says that she transported  pseudo-federine. Now, we think Mr. Wallace is a liar. He perjured himself at the preliminary hearing. He's got all kinds of credibility problems, but he did say it. But all that gets them is she's transporting pseudo-federine. They don't get the next step of, and she knows that pseudo-federine is used to manufacture methamphetamine. And all of her convictions fall without that part of the argument. Well, not all of her convictions. You mean her conspiracy convictions for the specified unlawful activity was the conspiracy. Yeah, but she was convicted of money laundering. Correct, for the specified unlawful activity of the conspiracy. Yeah, but the money laundering statute is different. It does not require knowledge of the particular unlawful activity. It just has to be unlawful activity, which she plainly knew she was engaged in, whether it was pseudo-federine or never mind that, in hiding money, because Michette told her he was hiding money. Clearly, the money laundering convictions, I would like them to fall, but they're not nearly as important to me as the 10-year minimum mandatory. I would assume that to be true. Well, I had somewhat of a different take on the same question or the same issue as Judge Reimer, and that is a person could affirmatively not know how you make meth, I mean have no idea, but still be convicted of money laundering for knowing that it has been manufactured and sold, even if they didn't know how it got there. There was some unlawful activity which proceeded. Right. I disagree that Ms. Jackson knew that there was some unlawful activity, but that's not the linchpin of my argument and clearly was not the focus of my briefs. I think that the sufficiency claim dovetails with the confrontation violation. This is a clear case of the adducing of guilty pleas, of non-testifying co-defendants, other girlfriends who pled guilty to doing things like Ms. Jackson did and were sentenced. And in a case where the government's arguing that, one, Ms. Jackson is smart, she's confident, she's put together, she's lyrically talented, and they use the trope of common sense throughout closing argument, in a reasonable cause to believe case, this is the most one of the most compelling confrontation issues that has not been objected to. Let me ask you the materiality question. Sure. Obviously, it's a plain error question. Yes. He testified that one of his girlfriends was in fact involved. Kimberly is correct. So the fact that there was evidence that one or two other, two girlfriends were involved that let's suppose should not have come in doesn't really have much clout, given his admission on the stand that his girlfriends were involved and given the overwhelming evidence that Jackson was involved in handling the boxes and in hiding his money and all sorts of other things. I mean, she may well not have known it was meth, but she sure was involved in what he was doing. So bottom line is what why is it prejudicial? That's why I attempted to address my reply brief, that there's a special. I know, but I'm asking the question now. Yes. The special status of a guilty plea. I mean, it is a formal declaration under oath. It is a testimonial statement, and it gives a judicial stamp of approval to that evidence. It's not just Mr. Easterling was involved, and that depends on the credibility of Mr. Mishad, which is by definition not terribly persuasive. It is a judicial acceptance and a declaration that, yes, these things happened, and it's not the same as Mr. Mishad testifying to when Mr. Easterling was involved and Ms. Pius Calderon was involved. Those are different things because it is different when you have made a personal declaration of guilt before a judicial officer. So if the government had cross-examined without mentioning the guilty pleas, really wouldn't have much of an issue. The guilty plea, the fact that it occurred in the court under oath, is the whole key to the issue. I'm going to save some time. Sounds like a good idea, Your Honor. Thanks. Good morning again, Your Honors. Peter Hernandez on behalf of the United States. May it please the Court. I'll start with Dr. Salem and then move on to Ms. Jackson. With regards to the Santos issues, Your Honor, I think it's clear that whether or not Santos applies is somewhat irrelevant in this particular case because, obviously, the government believes that it doesn't apply, that Santos is not something that should be applied to this case. But assuming that it is, Your Honor, what we had here was certainly profits, profits that Dr. Salem made by investing the $50,000 for the purchase of pseudofederant. So when the money comes back two months later or so in California when Mr. Salem is here in town, he's receiving pure profit from his investment. So that in and of itself is profit. It applies even if Santos is controlling him. Well, that is arguably looking at the profit issue from the wrong side of the coin. The question is whether it was profit to the operation, not to him. Right? Or is it him? Which way do you look at it? He's the one that's charged, Your Honor. I see the point with Mr. Miziat. If Mr. Miziat was here today, I think we'd have some issues regarding profit because Mr. Miziat is obviously controlling the money that he's receiving from Mr. Sarabia and then paying certain individuals whatever their investment return is. Your argument is that you look at it from the perspective of the investors. That's correct. And in this case, Dr. Salem was an investor, and what he received was profit. With regards to the discovery issue for Dr. Salem, again, Your Honor, I think it's clear from our brief that the statement was produced earlier on to former counsel. As we approached the trial, the government attempted to fax that statement off to new counsel. It didn't do it. It was a mistake. When it realized that the fax transmission sheet showed that it had not been sent, the government immediately provided that statement. But in addition to that, compounding that was the fact that the witness wasn't initially designated as a witness on the witness list. It asked Judge Takasugi for permission. It obviously, Judge Takasugi gave the defense counsel ample time to cross, knowing that the government had made a mistake. The government was willing to bring back the officer from Chicago to testify or be crossed by counsel if need be. But that opportunity wasn't taken in by the defense counsel. With regards to the ineffective assistance claim, Your Honor, I think, again, much like the earlier case, I think this is even a more compelling case in the sense that this case is controlled by Ross. Obviously, defense counsel was not an active member of the bar, certainly that Monday prior to closing, and obviously made a closing argument without being barred. But that doesn't necessarily make it a per se ineffective assistance claim. The record needs to be further developed in terms of what counsel did, what he didn't do, and that's something that needs to be developed down at the district court. With regards to the remaining time, I'd like to focus on Ms. Jackson. Ms. Jackson. I would like to hear you. Well, I have scoured the record in vain to find anything from which one could infer that Jackson knew or had reasonable cause to believe that the pseudoephedrine was to be used to make meth. Sure, she knew it was pseudoephedrine and she was involved in that. And sure, she knew that or there's plenty of evidence to show that she was aware that he was up to his eyeballs in criminal activity of some sort or other. No question about that, so assume that. She didn't – she testified, so arguably you could disbelieve her testimony, but she didn't testify that she didn't know. She didn't testify about meth. So as I read the record, there is absolutely no evidence that she had any basis for knowing that it was meth. Your Honor, I do agree preliminarily that with the court's analysis, there was no smoking gun in this case. This was a very difficult case to prove with regards to the evidence. But the government argued that she knew based on various inferences from the record. In other words, this was a long – What is the evidence from which you could draw a reasonable inference that she knew? Because, you know, we've had a bunch of these cases, so we're aware of how meth is manufactured and what goes into it, but that's not a person-on-the-street piece of knowledge. What specific evidence is there? Well, there's the activity that she engaged in, first and foremost. Testimony of Wallace, testimony of – But that's just a pseudo-affidavit. Right. No question about that. So suppose it was, you know, bald eagle feathers, and she knows that there's something illegal about carrying bald eagle feathers, and that's what it is. I mean, where's the connection to the thing that she carried versus the making of the meth? And to put it perhaps in the context that we are all so familiar with, which is Joe Hall, where there was a lot to show that he knew what pseudoephedrine was for. I mean, he had references to cooking. He was told he shouldn't sell in big quantities. He sold in huge quantities. He had matches for no purpose other than to cook. I mean, there was a lot there from which an inference could reasonably be drawn by a juror beyond a reasonable doubt. He had to have known. Right. Here there's none of that. Well, again, Your Honor, I think if you take everything as a whole, so you start off with Wallace. Wallace discussing the transportation of boxes. Someone in a reasonable state would know that you don't – you take a quick trip to Vegas, you come back and you have boxes in your trunk. You stay at your townhome. The next day you pick up that vehicle and you go take it somewhere and you drop it off and then you go eat breakfast and then you have someone take that car and go take it somewhere else and come back and the car is empty. You have boxes coming in from Chicago in a U-Haul truck filled with furniture up at the front in which you are then dividing up the garage, so to speak, with big boxes and small boxes and putting them in your garage and then the next morning someone coming in and taking some of those boxes. You have the – What does any of that have to do with her knowledge of how meth is made?  The only reason why you would want these pills, that's what the argument is, is in order to make methamphetamine. There's no other legitimate purpose for this. So it's an inference. There is no smoking gun in this particular case. The government argued that based on all these – It's the connection question. I mean, I know I gave kind of a silly example, but you don't make meth out of bald eagle feathers, but even if someone were clearly engaged in illegal activity and transporting something they shouldn't and it's coming and going from the garage, I don't understand how that shows a connection with the process of turning that item into something else. I understand the court's concern, and I think I would put it to the court this way as well. Whether it's bird feathers or whether it's pseudofedrin, to some extent, the person that is doing all these things at a certain point in time, knowing that his or her bank account is flush with cash, knowing that all these certain things are being done for her based on her partnership with these individuals, knowing that the cash – Is your argument that there's not that much money in pseudofedrin so it had to become from meth? That's part of the – Where is the evidence of that? I mean, how do we know what the market price of pseudofedrin is versus the market price of methamphetamine and that Ms. Jackson knew all that? Well, in terms of whether Ms. Jackson knew of it, again, the government believes there's certain inferences there. From what can you infer? From the testimony of the cooperators, from the bank records, which show cash into that, from the fact that she participated in turning cash that she received from Mr. Niziet into money orders and was using an alias, not her own name, to FedEx these – Well, that goes to the money laundering pretty clearly, but I'm still – Well, again, Your Honor, you can aid in a bet doing these certain things to assist or to further a drug conspiracy as well. So that goes to that problem as well. I understand the court's concern. Believe me, this is no smoking gun. This is no easy case to show. But what the government did at the end of the day was put various pieces of evidence from a longstanding conspiracy over the course of approximately 9 to 12 months to show that there were various inferences to suggest, to prove to the jury, that she knew that these pills that she transported and that she hid were going to be used to make methamphetamine. With regards to the confrontation issue and the cross-examination of Mr. Niziet, Mr. Niziet basically negated Ms. Jackson's intent or her actions. He testified that she didn't transport. She testified she wasn't unloading. He testified that she wasn't part of the delivery crew for the delivery of the drugs. He testified she wasn't taking these pills to the buyer with Wallace and Niziet. So that necessarily, if he didn't negate the intent before, Mr. Niziet basically negated any sort of intent that the government could argue an inference to show her knowledge. So the government's intent on this was to lessen the credibility of Mr. Niziet at cross. Now, should it, looking back and reflecting, should have it not asked the ultimate question? Potentially, with respect to Ms. Pius Calderon. But nevertheless, Your Honor, the point of the testimony was at cross and during the rebuttal argument was to lessen the credibility of Mr. Niziet. I'm sure, but the only way you could accomplish that was to offer the pleas for the truth of the matter asserted. That is, that they were involved in one of his conspiracies. Well, to show that he was less credible. Yeah, but I mean, yeah. But you offer it for the truth. I mean, so it's plainly testimonial. Well, to some extent, Your Honor. But having that, having said that, though, I think we run into these issues all the time because if we're using something to impeach someone, to say someone is not being credible, most of the time, it's been my experience, that you would use a statement that the government believes is credible. And it's not just you. Most of the time you're sitting right here on the stand saying it. And that's perfectly okay. What's the problem? There is no problem. It was in there subject to cross-examination. The problem here was that there were out-of-court declarations offered for the truth of the matter asserted. And, Your Honor, I think to some extent if the Court is inclined to say that it is testimony, I think obviously the plain error review would apply. The government believes there was other evidence. And why do you believe that it wasn't prejudicial? Well, Your Honor, I think the whole point, it's not prejudicial because what I'm, what the government was trying to show at that point in time in the rebuttal argument is to suggest to the jury that anything that came out of Mr. Mizziat's mouth, the fact that he negated her activity during the course of a longstanding conspiracy, could not be trusted, should not be believed. In terms of that, so that was the point of the government's argument on that, on that issue. Your Honor, the Court, if the Court wants me to address the safety valve issue, I can. Otherwise, I can just sit down. Anything else? No. Thank you. Okay. Thank you, Mr. Hernandez. Mr. Rosenblum. Mr. Rosenblum, Your Honors. No smoking gun. That's a different way of saying no evidence of Ms. Jackson's knowledge that pseudo-pledging could be made in that. I'm not going to point that, go over that because I think the point is established. But doesn't that mean that she has to win the confrontation claim? I mean, if it is the case that they don't have almost anything on her intent, then any error, you know, when you have a really wobbly case, a small amount of prejudice is enough. But the case isn't so wobbly on money laundering, and so the issue is whether the confrontation clause assuming a violation is nevertheless prejudicial so far as that conviction is concerned. It doesn't sound like I'm persuading Your Honors on the money laundering, but the big concern, of course, is the 10-year minimum mandatory because if Your Honors reverse on the conspiracy count, there's no minimum mandatory applicable to the case, and the district court is certainly going to get her time served. This district court put off sentencing three times to give her a chance to do the safety valve, encouraged it, did what he could. It just didn't work out. And there's no question in my mind that if she gets back there for resentencing, it's going to be time served. So with that, I'd encourage Your Honors to do justice quickly in this case because Ms. Jackson shouldn't be in prison for 10 years. That's agreed just given these facts. Okay. Thanks, Your Honors. Thank you. Okay. Thank you, counsel. All of you, the matter just argued will be submitted, and the court will stand in recess for the day. All rise.
judges: Rymer, Graber, Bea